Honorable Mike K. Nakagawa, United States Bankruptcy Judge
The humorist Douglas Adams was fond of saying, "I love deadlines. I love the whooshing sound they make as they fly *905 by." But the law more often follows Benjamin Franklin's stern admonition: "You may delay, but time will not." To paraphrase Emile Zola, deadlines are often the terrible anvil on which a legal result is forged.
Anwar v. Johnson (In re Johnson), 720 F.3d 1183, 1184
(9th Cir. 2013) (Thomas, C.J.)
The best defense is a good offense.
Vince Lombardi, former Green Bay Packers head coach[2]
This is a case where a reorganized debtor missed a deadline set forth in its confirmed Chapter 11 plan and then seeks to "enforce" the confirmed plan to avoid the very consequence it agreed to bear.
BACKGROUND
On January 5, 2016, Mohave Agrarian Group, LLC ("Debtor") filed a voluntary Chapter 11 petition for reorganization. (ECF No. 1).
On January 19, 2016, Debtor filed its schedules of assets and liabilities ("Schedules"). (ECF No. 17). On its property Schedule "A/B," Debtor listed an interest in approximately 8,888 acres of real property located in Arizona ("Arizona Property") valued at $16,510,000. On its creditor Schedule "D," Debtor listed Contrail Holdings, LLC ("Contrail") as having a claim secured by the Arizona Property with a balance owing of $7,700,172. On its Schedule "E/F," Debtor listed the Assessor of Mohave County ("Mohave County Assessor") as having various priority unsecured claims for unpaid real estate taxes.
On May 3, 2016, Contrail filed a proof of claim in the amount of $8,177,909.05, secured by a promissory note and deed of trust against the Arizona Property.
On June 27, 2016, Debtor filed a motion to value the Arizona Property ("Valuation Motion") and scheduled it for a hearing to be held on August 10, 2016. (ECF Nos. 94 and 98). Contrail submitted appraisal testimony valuing the Arizona Property at $9,625,000, see Declaration of Robert E. Dietrich (ECF No. 110), while the Debtor submitted appraisal testimony valuing the Arizona Property "as is" at $31,400,000. See Supplemental Declaration of Evan Ranes. (ECF No. 122).
On August 25, 2016, a stipulation was filed to coordinate discovery in connection with the Valuation Motion, as well as the Debtor's anticipated Chapter 11 plan, in addition to Contrail's anticipated motion for relief from stay. (ECF No. 130).
On September 2, 2016, Debtor filed its "First Amended Chapter 11 Plan of Reorganization Dated September 2, 2016" ("First Amended Plan"), along with a proposed disclosure statement. (ECF Nos. 136 and 137).[3]
*906 On September 2, 2016, Contrail filed its motion for relief from stay ("Stay Relief Motion"). (ECF No. 140).
On October 5, 2016, an objection to the disclosure statement was filed on behalf of Contrail (ECF No. 176), to which a reply was filed by Debtor on October 12, 2016 (ECF No. 180).
On October 26, 2016, Debtor filed its first amended disclosure statement, along with a redlined version. (ECF Nos. 187 and 188).
On November 2, 2016, a hearing was held on approval of the proposed amended disclosure statement.
On November 9, 2016, an order was entered approving the adequacy of the amended disclosure statement and setting a plan confirmation hearing for January 23, 2017. (ECF No. 195).
On November 18, 2016, the Stay Relief Motion was noticed to be heard on the same date as the plan confirmation hearing. (ECF No. 204). On January 9, 2017, an opposition to the Stay Relief Motion was filed by Debtor (ECF No. 239), and on January 20, 2017, a reply was filed by Contrail (ECF No. 310).
On November 23, 2016, Debtor filed a motion for order authorizing the private sale of Debtor's real property to Encore Investments, LLC ("Encore Sale Motion"), free and clear of liens, which was noticed to be heard on January 23, 2017. (ECF Nos. 208 and 211). On January 12, 2017, an omnibus opposition was filed by Contrail (ECF No. 263), and on January 20, 2017, a reply was filed by Debtor (ECF No. 317).
On December 1, 2016, Debtor filed a motion for order authorizing the private sale of Debtor's real property to James D. Hammer ("Hammer Sale Motion"), which also was noticed to be heard on January 23, 2017. (ECF Nos. 219 and 222). On January 12, 2017, an omnibus opposition was filed by Contrail (ECF No. 263), and on January 20, 2017, a reply was filed by Debtor (ECF No. 317).
On January 13, 2017, a stipulation was filed to move the trial date regarding the following contested matters: First Amended Plan, Valuation Motion, Stay Relief Motion, Encore Sale Motion, and Hammer Sale Motion. (ECF No. 272). The trial was rescheduled to be held on January 26, 30 and 31, 2017. On January 17, 2017, an order was entered approving the stipulation. (ECF No. 283). On January 19, 2017, Debtor filed its redlined version of a proposed second amended plan. (ECF No. 300).
On January 26, 2017, the trial commenced.
On January 31, 2017, the trial was continued to March 13, 2017, in order to permit discovery to be conducted concerning a matter raised in the trial testimony of the Debtor's principal. (ECF No. 359).
On March 13, 2017, the parties informed the court that between January 31 and March 12, 2017 ("Trial Hiatus"), a compromise had been reached. Under the compromise, Contrail would purchase the Arizona Property from the Debtor, subject to an option allowing the Debtor to repurchase the Arizona Property in the future ("Option"). The Debtor and Contrail agreed to file no later than March 16, 2017, a motion to approve a settlement agreement and mutual releases. They also agreed that the Debtor would file a further amended plan incorporating the settlement, as well as a further amended disclosure statement. (ECF No. 407).
On March 16, 2017, Debtor's Motion for Approval of Settlement, Pursuant to Fed. R. Bankr. P. 9019, By and Among Mohave *907 Agrarian Group, LLC, and Contrail Holdings, LLC ("Settlement Motion") was filed.[4] On March 17, 2018, Debtor filed a Third Amended Chapter 11 Plan of Reorganization ("Third Amended Plan") and a proposed Second Amended Disclosure Statement Prepared in Connection with Debtor's Third Amended Chapter 11 Plan of Reorganization ("Second Disclosure Statement"). (ECF Nos. 408, 412, and 413).
On March 20, 2017, an order was entered granting Debtor's request to shorten time so that the Settlement Motion could be heard on an expedited basis. (ECF No. 418).
On March 22, 2017, Debtor filed a "Plan Supplement" that included various documents that were not attached to the Third Amended Plan, but which apparently were submitted for the purpose of "supplementing and giving effect to the terms of the plan." (ECF No. 423). One of those documents consisted of a "Memorandum of Option and Purchase and Sale Agreement" to be recorded in Mohave County ("Option Memorandum").
On March 23, 2017, an order was entered granting Debtor's request for conditional approval of the Second Disclosure Statement, as well as scheduling a combined hearing on confirmation of the Third Amended Plan and final approval of the Second Disclosure Statement. (ECF No. 425).[5]
On March 30, 2017, a hearing was held on the Settlement Motion and on April 4, 2017, an order was entered approving the settlement ("Settlement Approval Order"). (ECF No. 436).
On April 13, 2017, a Declaration of James Rhodes in support of confirmation of the Third Amended Plan ("Rhodes Confirmation Declaration") was filed. (ECF No. 443).
On April 18, 2017, a combined hearing was held on confirmation of the Third Amended Plan and final approval of the Second Disclosure Statement. At the hearing, the proposed plan was confirmed and the disclosure statement was approved.
On May 2, 2017, findings of fact and conclusions of law were entered in support of plan confirmation and disclosure statement approval ("Confirmation Findings"). (ECF No. 445).
On May 8, 2017, an order was entered confirming the Third Amended Plan ("Plan Confirmation Order"). (ECF No. 446). A copy of the Third Amended Plan ("Confirmed Plan") is attached as Exhibit "1" to the Confirmation Order.[6]
*908 On November 14, 2017, an Order Entering Final Decree was filed ("Final Decree"). (ECF No. 480). As a result, the Chapter 11 case was closed without prejudice to being reopened for further administration.
On March 14, 2018, the Reorganized Debtor's Motion for Order: (I) Reopening Chapter 11 Case; and (II) Enforcing Confirmed Chapter 11 Plan ("Motion") was filed by the Debtor, accompanied by another Declaration of James M. Rhodes ("Second Rhodes Declaration")[7] . (ECF Nos. 482 and 483).
On March 16, 2018, an order was entered granting Debtor's request to shorten time so that the instant Motion could be heard on an expedited basis. (ECF No. 487).
On March 29, 2018, Contrail filed an opposition to the Motion ("Opposition"), along with declarations from William M. Noall ("Noall Declaration"), Ryan H. Esplin ("Esplin Declaration"), and Allen Barbarich ("Barbarich Declaration"). (ECF Nos. 489, 490, 491, and 492).
On April 2, 2018, Debtor filed a reply ("Reply"). (ECF No. 493).
On April 4, 2018, the court heard the instant Motion and the appearances of counsel were noted on the record. After oral arguments were presented, the matter was taken under submission.
On April 18, 2018, as instructed by the court at the hearing, the Supplemental Declaration of William M. Noall ("Supplemental Noall Declaration") was filed. (ECF No. 498).
THE REQUESTED RELIEF
By the instant Motion, Debtor seeks to reopen this Chapter 11 proceeding as permitted by the Final Decree. Debtor's purpose in reopening the case is to obtain a "ruling that the Option remains in full force and effect under the terms of the Confirmed Plan and Confirmation Order ..." Motion at 10:7-8. The Motion is brought under Section 105(a) and FRBP 9019(a). Id. at 2:21-22. As the moving party, Debtor bears the burden of persuasion by a preponderance of the evidence. See generally Wright & Graham, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE 2d, ¶ 5122 (2005 and 2017 Supp.); see also In re Tallerico, 532 B.R. 774 (Bankr. E.D. Cal. 2015) (discussing burdens of production, proof and persuasion).
Contrail maintains that the requested ruling cannot be granted by motion, but must be sought through an adversary proceeding for declaratory relief. See Opposition at 4:3-5.[8] Moreover, Contrail argues that the Option terminated under the terms of the Settlement Agreement, Option Agreement, Assessor Note, Confirmed Plan, and Plan Confirmation Order, because the Debtor failed to comply with the applicable deadline for the Mohave County Assessor to receive monthly payments *909 on the Assessor Note. Id. at 4:8 to 8:17 and 13:15 to 14:9.
Debtor replies that Mohave County has not declared that the Assessor Note is in default and maintains that Contrail has not been prejudiced by a technical default. See Reply at 2:5 to 3:9. It maintains that Contrail "has manufactured a dispute in order to nullify the Option,"id. at 3:11, and that Contrail has engaged in "bad faith attempts to capitalize on a de minimis, technical, administrative error for which [Debtor] was expressly excused by the County ..." Id. at 4:4-6.
DISCUSSION
The Motion to reopen the Chapter 11 case will be granted inasmuch as Contrail does not oppose and good cause otherwise exists. The Motion to enforce will be denied for the reasons discussed below.
1. The Documentary Record.
Under the Settlement Agreement, Contrail was permitted to purchase the Arizona Property by credit bidding the amount of its claim.[9] See Settlement Agreement, § 4.1.1. The purchase would be effectuated through a Purchase and Sale Agreement ("Sale Agreement"), a copy of which was attached as Exhibit "A" to the Settlement Agreement. Upon completion of the sale to Contrail for the credit bid amount, all of the indebtedness would be satisfied, and the Debtor's principal would be released of his personal guaranty. Id., § 4.1.3.
Under the Settlement Agreement, Contrail also granted to the Debtor a non-assignable option ("Option") to purchase the Arizona Property back from Contrail after the Sale Agreement was completed. See Settlement Agreement, § 4.2.1. The Option would be effectuated through an Option and Purchase and Sale Agreement ("Option Agreement"), a copy of which was attached as Exhibit "B" to the Settlement Agreement. Debtor was responsible to pay all taxes, interest and penalties owed to Mohave County ("Mohave Tax Obligations") pursuant to the Assessor Note. See Settlement Agreement, § 4.2.2. That provision of the Settlement Agreement specifically states, in pertinent part, that "if any payment with respect to any Taxable Parcel is not received from [Debtor] by the Mohave County Assessor on or before the due date pursuant to such Assessor Note, the Option and Sale Agreement and Option thereunder shall immediately and automatically terminate without further notice and be of no force and effect." Id. (emphasis added).[10]
Under the Settlement Agreement, Debtor was required to amend its proposed Chapter 11 plan to include the settlement terms between the parties. See Settlement Agreement, § 5. The parties agreed that in the event of any dispute or conflict between the Settlement Agreement and the proposed Chapter 11 plan, the terms of the Settlement Agreement would control. Id. Moreover, the parties specifically agreed that in the event an order confirming *910 the proposed Chapter 11 plan was not timely entered, an ex parte order terminating the automatic stay would be entered permitting Contrail to foreclose on the Arizona Property. See Settlement Agreement, § 6. Copies of a stipulation for relief from stay along with a proposed order were attached as Exhibits "C" and "D" to the Settlement Agreement.
Under the Sale Agreement, Debtor was specifically permitted to pay delinquent taxes and assessments over time pursuant to the Assessor Note. See Sale Agreement, § 11.1.
Under the Option Agreement, a list of purchase prices was set forth in a table ("Take Down Schedule") attached as Exhibit "A" thereto, and the initial plus two additional option periods were set forth. See Option Agreement, at 4(a) and (b). It specifies in pertinent part that the Debtor may exercise the option "[p]rovided that (i) [Debtor] has not defaulted under this [Option] Agreement or the Settlement Agreement, and (ii) the Option and this [Option] Agreement have not been terminated pursuant to its terms ..." Id. at 4(c) (emphasis added).[11]
Under the Assessor Note, Debtor agreed to pay Mohave County the principal amount of $86,331.72. See Assessor Note, § 1. Interest accrued at 3.5 percent per annum. Id., § 2. Payments commencing May 17, 2017, were to be made in 24 equal monthly installments of $3,597.16, plus interest, until the note matured on April 30, 2019. Id., § 3. Payments were to be made to the Mohave County Treasurer at its mailing address, c/o Mohave County Attorney's Office, in Kingman, Arizona. Id., § 4. A failure to make any payment when due constitutes an event of default. Id., § 6. The Assessor Note cannot be amended or modified without a written instrument signed by the Mohave County Treasurer. Id., § 15.
Under the Second Disclosure Statement, the Debtor's obligation to pay the Mohave Tax Obligations under the Settlement Agreement is disclosed. See Second Disclosure Statement, Art. V, § 5.5(b), 34:3-18. Consistent with the language of the Settlement Agreement, the language in the Second Disclosure Statement specifically states that "if any payment with respect to any Taxable Parcel is not received from Debtor by the Mohave County Assessor on or before the due date pursuant to the Assessor Note, the Option/Sale Agreement and Option thereunder shall immediately and automatically terminate without further notice and be of no force and effect." Id. at 34:6-10 (emphasis added).
Under the Confirmed Plan, the terms of the Settlement Agreement and description in the Second Disclosure Statement were incorporated as the treatment of Contrail's claim under Class 2. See Confirmed Plan, Art. II, § 2.3(b), 19:14 to 24:2.[12] Consistent with the language in the Settlement Agreement, the language in the Confirmed Plan specifically states that "if any payment with respect to any Taxable Parcel is not received from the Reorganized Debtor by the Mohave County Assessor on or *911 before the due date pursuant to such Assessor Note, the Option/Sale Agreement and Option thereunder shall immediately and automatically terminate without further notice and be of no force and effect." Id. at 22:10-14 (emphasis added). Additionally, the Confirmed Plan provides for the claims of the Mohave County Assessor to be paid by the Debtor through the Assessor Note, secured by the Arizona Property. Id. at § 2.3(c).
Under the Plan Confirmation Order, the terms of the Settlement Agreement, the Sale Agreement, and the Option Agreement, among others, are ordered to be "legal, valid, binding, and authorized obligations of the Reorganized Debtor, enforceable in accordance to their terms." Plan Confirmation Order at 3:21 to 4:3.[13] Consistent with the language in the Settlement Agreement, the language in the Plan Confirmation Order specifically states that "if any payment with respect to any Taxable Parcel is not received from the Reorganized Debtor by the Mohave County Assessor on or before the due date pursuant to such Assessor Note, the Option/Sale Agreement and Option thereunder shall immediately and automatically terminate without further notice and be of no force and effect." Id. at 5:20-24 (emphasis added).[14]
In support of the Plan Confirmation Order, the court specifically found that "All documents and agreements necessary to implement the Plan, expressly including the Operative Documents, have been negotiated in good faith, at arm's length, and are in the best interest of Debtor, its Estate, and the Debtor's Creditors." Confirmation Findings, ¶ 29. The court also found that "the settlements, compromises, discharges, releases, and injunctions set forth in the Plan are approved as an integral part of the Plan, are fair, equitable, reasonable, and in the best interest of the Debtor, its Estate, and the Holders of Claims and Equity Interests." Id., ¶ 31 (emphasis added).
2. The Debtor's Payments.
Attached as Exhibit "4" to the Noall Declaration is a copy of an email dated July 20, 2017, from counsel for Mohave County and counsel for the Debtor. That email includes a chain of prior email messages between the same counsel. The email dated June 19, 2017, at 3:39 p.m., from Debtor's counsel to counsel for Mohave County, expresses their understanding that the first payment under the Assessor Note would be due on June 19, 2017, and on the 18th day of each subsequent month. Compare Second Rhodes Declaration, ¶ 17. The email dated June 20, 2017, at 10:05 a.m., from Debtor's counsel to counsel for Mohave County represented that the Debtor had been instructed "to set up an auto pay to have a check cut on the 15th of every month so there are no issues ..."
Attached as Exhibit "H" to the Esplin Declaration is a copy of a subsequent email dated March 7, 2018, on the subject of the "Verification of Payments by Mohave Agrarian Group." That email is from counsel for Mohave County to counsel for the Debtor. The email lists ten checks of various dates sent on behalf of the Debtor, as *912 well as the dates on which each check was received by Mohave County. Out of the first five checks listed, three were received by Mohave County after the 18th day of the relevant month (June, July and October). The last five checks listed apparently were received before they were due under the Assessor Note.[15]
At the hearing in this matter, Debtor conceded that the list of checks set forth in the March 7, 2018, email from counsel for Mohave County, accurately sets forth the dates that payments on the Assessor Note were received by the Mohave County Assessor. See also Second Rhodes Declaration, ¶ 18.
3. The Requested Relief Revisited.
The language in the Settlement Agreement was the result of substantial negotiations between the parties during the Trial Hiatus. Both the Debtor and its principal acknowledged that they were represented by legal counsel in drafting, negotiating, and executing the Settlement Agreement, and fully and clearly understood all of its terms and effects. The pertinent language certainly requires the Debtor's payments to the Mohave County Assessor to be "received ... on or before the due date" under the Assessor Note. The Settlement Agreement was approved by the court after noticed hearing and no appeal was taken.
The same language from the Settlement Agreement was included in the Third Amended Plan submitted for confirmation by the Debtor. The same language was included in the Confirmed Plan as well as in the Plan Confirmation Order submitted by the Debtor. No appeal was taken from the Plan Confirmation Order.
Contrail asserts that the first payment to Mohave County was due on May 17, 2017, under the language of Section 3 of the Assessor Note. See Opposition at 13:17-19. Inasmuch as the first payment admittedly was received on June 26, 2017, Contrail maintains that the agreed requirements were not met, and the Option therefore terminated "immediately and automatically" and "without further notice." Id. at 14:1-6.
Alternatively, Contrail argues that even if the first payment was due on June 19, 2017, and the 18th day of each month thereafter, the first payment still was not received by Mohave County until June 26, 2017, well after any ambiguity was resolved. See Opposition at 13:21 to 14:6. Under the language of the same Operative Documents, the Option immediately and automatically terminated without further notice. Moreover, even if the first payment was excused, the Option separately terminated as a result of the payments received after the 18th day in July 2017 and October 2017. Id. at 8:10-13 and 9:4-10.
Debtor does not dispute that on at least two occasions it missed the applicable payment deadline under the Assessor Note, see discussion at 911-12, supra, but argues that it should be excused from the consequence set forth in the Settlement Agreement, Confirmed Plan, and Plan Confirmation Order. That consequence by its express terms, however, was immediate and automatic, and therefore self-executing. This was the specific bargain *913 reached by the parties during the Trial Hiatus. If the settlement had not been reached, the trial on the First Amended Plan, Valuation Motion, Stay Relief Motion, Encore Sale Motion, and Hammer Sale Motion would have proceeded. Both sides took vastly different positions regarding the fair market value of the Arizona Property: Debtor's expert asserted that it was worth $31,400,000, while Contrail's expert asserted that it was worth $9,625,000. Both sides had much to lose inasmuch as the Debtor sought to confirm a dirt for debt plan over Contrail's objection, while Contrail sought relief from stay to foreclose on the entire Arizona Property. The uncertain outcomes, as well as the attendant legal expenses, were avoided by both parties through a carefully negotiated settlement that would be expressly incorporated in the Debtor's proposed plan of reorganization.[16]
Debtor's request to be relieved from its agreement is based solely on Section 105(a) and FRBP 9019(a). As to the latter, the rule merely sets forth the manner in which approval of a settlement or compromise may be sought in a bankruptcy proceeding. FRBP 9019(a) does not, however, provide any basis or authority for granting relief from a settlement that previously was approved. The Settlement Approval Order was never appealed.
As to the former, Section 105(a) provides in pertinent part that a bankruptcy court "may issue any order ... that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). The equitable authority granted by Section 105(a), however, cannot contravene specific provisions of the Bankruptcy Code. See Law v. Siegel, 571 U.S. 415, 134 S.Ct. 1188, 1196, 188 L.Ed.2d 146 (2014) ("We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."); Li v. Rosen (In re Li), 2018 WL 1354548, at *9 n.14 (9th Cir. BAP Mar. 12, 2018) ; Olson v. Van Meter (In re Olson), 2018 WL 989263, at *4 (9th Cir. BAP Feb. 5, 2018).
Under Section 1127, a plan proponent or reorganized debtor may modify a confirmed plan only before substantial consummation, but not after. 11 U.S.C. § 1127(b). In this case, the Confirmed Plan has been substantially, if not fully consummated, with the completion of the Arizona Property sale to Contrail. The Settlement Agreement was not a separate "side agreement" between parties and the court specifically found that it was an integral part of the Confirmed Plan that resolved the primary dispute in the Chapter 11 proceeding. The Confirmed Plan, therefore, cannot be modified by ignoring its express language in favor of, nor to the detriment of, any party.
Under Section 1141, the provisions of a confirmed Chapter 11 plan "bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor ..." 11 U.S.C. § 1141(a). In this case, the Plan Confirmation Order is a final judgment that binds the Debtor, Contrail, Mohave County, any other creditors, and the equity security holders to the terms and effect of the Confirmed Plan. See United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 275, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010) ; Travelers Indemnity Co. v. Bailey, 557 U.S. 137, 152, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009). The court cannot relieve any of the parties from the effect of the judgment.
*914 As a matter of law, the Confirmed Plan cannot be modified. As a matter of law, the Confirmed Plan is binding. Under these circumstances, the court concludes that Section 105(a) does not permit the relief requested by the Debtor.
But even if the court was able to apply equitable considerations and maxims as a source of relief from the payment deadline, the court concludes that the relief requested by the Debtor is inappropriate. In this case, the Third Amended Plan that ultimately became the Confirmed Plan was proposed by the Debtor, rather than a creditor's committee or any other interested party. Irrespective of the statutory import of Section 1141(a), the doctrine of judicial estoppel would prevent the Debtor from asserting a position inconsistent with the express language of its Confirmed Plan. See New Hampshire v. Maine, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). But the Debtor in this case does not want to accept the consequences of the chosen language.
Instead, the Debtor asserts the equitable maxim that "equity abhors a forfeiture," see Motion at 9:17-21, and accuses Contrail of manufacturing a dispute and acting in bad faith. See discussion at 908-09, supra. It even asserts that Mohave County has not declared a default on the Assessor Note in spite of the late payments, see Reply at 2:10 to 3:7, and that Contrail has no remedies available under the Assessor Note because it is not a party to the Assessor Note. Id. at 3:8-9. Debtor's arguments, however, miss the point of giving effect to the express language chosen by contracting parties. No one forced the Debtor or Contrail to settle the various contested matters, and the creation of the Option was not an equitable remedy imposed by the court.[17] Rather, the arguments raised by the Debtor suggest why Contrail bargained for the specific language in the Settlement Agreement, Confirmed Plan, and Plan Confirmation Order: the time of delivery to, and receipt of the payments by, the Mohave County Assessor were entirely within the Debtor's control. Timely compliance was easily confirmable, and Mohave County's subsequent treatment of the payments under the Assessor Note was immaterial to the creation and preservation of the Option under the Settlement Agreement.[18] Immediate and automatic termination of the Option was the self-executing consequence of the Debtor's failure to meet a simple and clear requirement.[19]
*915 Finally, the court required Contrail to provide evidence of the legal expenses it has incurred in connection with the Motion so that the court could take such costs into account. While the amount incurred by Contrail might or might not pale in comparison to the legal fees incurred by the Debtor in this proceeding,[20] the record plainly establishes that this Chapter 11 proceeding essentially has involved a dispute between two well-funded and sophisticated parties. At its core, reorganization through Chapter 11 is intended by Congress to permit a debtor to pay its creditors, retain its employees, and preserve the equity of its investors. See United States v. Whiting Pools, Inc. (In re Whiting Pools, Inc.), 462 U.S. 198, 203, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).
In this case, the Confirmed Plan provided for the payment of creditors only in Class 2 and Class 3, i.e., Contrail and the Mohave County Assessor. See note 6, supra. The Debtor had no employee expenses and paid no salaries during the Chapter 11 proceeding.[21] The equity holders consisted of entities owned or controlled by the Debtor's principal, and the new equity holders are the same or similar entities. See Second Disclosure Statement, Art. V, § 5.7(b)(1); Confirmed Plan, Art. I, § 1.66; Rhodes Confirmation Declaration at ¶ 2. In other words, this Chapter 11 proceeding has done little to serve the purposes that Congress intended. Under these circumstances, granting the Debtor relief from the specific consequences of the very plan of reorganization that it negotiated has little or no equitable basis.
Because relief from requirements under Section 1127(b) and Section 1141(a) is not available under Section 105(a) nor under FRBP 9019(a), the court concludes that the Option terminated under the express terms of the Settlement Agreement, Confirmed Plan, and Plan Confirmation Order. Moreover, to the extent that equitable authority to grant relief exists, the Debtor has failed to meet its burden of persuasion and proof that equitable relief from the Settlement Agreement, Confirmed Plan, and Plan Confirmation Order is appropriate under the circumstances in this case.
CONCLUSION
For the reasons stated above, the instant Motion will be granted in part and denied in part. This Memorandum Decision constitutes the court's findings of fact and conclusions of law pursuant to FRBP 9014(c), FRBP 7052, and FRCP 52(a). A separate order has been entered contemporaneously herewith.

There is some debate as to whether the oft-quoted phrase should be attributed to the iconic football coach or to other historical figures. See https://www.fluther.com/29471/famous-quote-or-misquote/. In law, the phrase has been used by some authors to describe the strategy of responding to a claim by aggressively asserting a right that does not exist. See Edward C. Greenberg & Jack Reznicki, The Copyright Zone: A Legal Guide for Photographers and Artists in the Digital Age, at 238-239 (CRC Press 2nd ed. 2015).

Debtor sought a determination that the Arizona Property far exceeded the amount of Contrail's claim in order to cramdown a "dirt for debt" treatment of Contrail's allowed secured claim under Section 1129(b)(2)(A)(iii). See Valuation Motion at ¶ 46; First Amended Plan, Art. II, § 2.3(b), 18:4 to 20:2. See, e.g., Arnold & Baker Farms v. United States (In re Arnold & Baker Farms), 85 F.3d 1415 (9th Cir. 1996), cert. denied, 519 U.S. 1054, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997) (denying confirmation of plan where evidence did not support finding that replacement real property collateral provided indubitable equivalent of allowed secured claim).

Along with the Settlement Motion, Debtor submitted the supporting Declaration of James M. Rhodes ("First Rhodes Declaration"). (ECF No. 409). A copy of a Settlement Agreement and Mutual Release dated March 12, 2017 ("Settlement Agreement") was attached as Exhibit "1" to the First Rhodes Declaration.

Debtor's request for conditional approval of the Second Disclosure Statement and a combined hearing was accompanied by another Declaration of James M. Rhodes. (ECF No. 415). Debtor's principal attested that an extensive hearing to confirm the plan would not be necessary because, inter alia, there "is nothing complex or obscure in the Plan and supporting documents." Id. at 6:26.

The Confirmed Plan consists of six classes of claims or interests, five of which are impaired. See Confirmed Plan, Art. II, § 2.3, 19:1 to 25:18. Contrail's Class "2" claim is treated in accordance with the Settlement Agreement. Mohave County Assessor's Class "3" claim is treated through the Assessor Note secured by the Arizona Property. The Class "4" unsecured claim of John Garrett receives no distribution. The Class "5(a)" claims of non-insider general unsecured creditors, as well as the Class "5(b)" of insider unsecured creditors Avery Land Group, f/k/a Kingman Farms, LLC, and Shumway Well Waters Systems, also receive no distribution. The Class "6" interests of former equity holders have their equity interests cancelled and receive no distribution.

A copy of the "Assessor Refinanced Secured Tax Promissory Note dated May 17, 2017" ("Assessor Note") was attached as Exhibit "3" to the Second Rhodes Declaration. Under the Assessor Note, in the principal amount of $86,331.72, Debtor is the payor and the Mohave County Treasurer is the payee. The note is secured by the Arizona Property. It is signed by the Debtor through its manager, Truckee Springs Holdings, Inc. Because it is neither an obligor nor an obligee, Contrail is not a party to the Assessor Note.

At the hearing on the Motion, however, Contrail requested that the court rule on the merits of the Debtor's request and did not object to the reopening of the Chapter 11 proceeding. The parties having fully briefed the merits, the court concludes that both the Debtor and Contrail have consented to resolution of this matter without necessity of an adversary proceeding.

The parties agreed that the amount of Contrail's claim as of March 10, 2017, was no less than $9,611,696.19, and that interest, legal fees and costs would continue to accrue until completion of the sale. See Settlement Agreement, Recital C, 2.

The Settlement Agreement was negotiated during the Trial Hiatus among sophisticated parties represented by highly qualified legal counsel. To emphasize the point, the following language appears: "[Debtor] has been represented by legal counsel in connection with the drafting, negotiation and execution of this Agreement and is fully aware of and clearly understands all of the terms and provisions contained in this Agreement and the effect thereof..." Settlement Agreement, § 7.5. Identical language with respect to the Debtor's principal also appears in the document. Id., § 8.7.

The Option Memorandum contains similar language: "Solely upon satisfaction of the terms and conditions set forth in the Option Agreement, including without limitation no default by [Debtor] thereunder or the Settlement Agreement, the Initial Option Period may be extended..." Option Memorandum, ¶ 3(a) (emphasis added).

The Settlement Agreement is categorized as a "Key Transaction Document" under the Confirmed Plan, which also includes the Sale Agreement, the Option Agreement, the Option Memorandum, the Plan Confirmation Order, the Confirmed Plan, and other reasonably necessary documents. See Confirmed Plan, § 1.61. Each of the Key Transaction Documents is an "Operative Document" under the Confirmed Plan. Id., § 1.69.

The order confirming the plan acknowledges that the Option is the product of the parties' express agreement and therefore "is not, and shall not be deemed or construed as, an equitable or constructive mortgage or lien." Plan Confirmation Order at 5:14-15.

The order also states that in the event of a conflict between the order and the Confirmed Plan, the terms of the order will control, subject to the provisions of the Settlement Agreement. See Plan Confirmation Order at 8:15-17. In this instance, however, there is no conflict or inconsistency amongst the documents.

Copies of the checks received by the Mohave County Treasurer are included with the March 7, 2018, email, and all are from an entity identified as Gypsum Resources Materials, LLC. None of them are drawn from an account in the name of the Debtor or from an account of the Debtor's counsel. All of the checks apparently were mailed from Nevada and the check dated October 18, 2017, therefore would not have been received in Arizona until after the October due date. The checks for June, July and October are all dated after the 15th day of the month, contrary to the apparent directions of Debtor's counsel. See discussion at 910-12, supra.

Indeed, the Debtor stipulated to relief from stay permitting Contrail to foreclose on the Arizona Property in the event a plan incorporating the Settlement Agreement was not timely confirmed. See discussion at 909-10, supra.

The Plan Confirmation Order specifically acknowledged that the Option was not to be deemed or construed as an equitable or constructive mortgage or lien. See note 13, supra.

Because Contrail relies on the terms of the Settlement Agreement and Confirmed Plan, Debtor's suggestion that a default under the Assessor Note would be excused under Arizona law, see Reply at 3:20-24, is irrelevant.

In addition to accusing Contrail of manufacturing a dispute and acting in bad faith, Debtor argues that specific language for the receipt of tax payments "was not intended to set a trap" terminating the Option. See Motion at 7:26-28 and 9:26-28. Assuming the Debtor is referring to a legal trap rather than a physical one, e.g., a hole in the ground covered with branches, it seems to ignore its express acknowledgment in the Settlement Agreement that it was represented by legal counsel and clearly understood all of its terms, provisions, and effects. See note 10, supra. Also included in the Settlement Agreement was a provision releasing the Debtor's principal of his personal guaranty upon completion of the sale to Contrail, while providing the Option under express conditions. Even the Debtor's principal expressed that the Confirmed Plan and related documents contained nothing that was complex or obscure. See note 5, supra. Moreover, it is somewhat odd for the Debtor to assert that it was the victim of a trap when its counsel specifically recommended easy steps to avoid falling into it. See note 15, supra.

Contrail apparently incurred legal expenses in excess of $700,000 during the Chapter 11 proceeding, see Barbarich Declaration at ¶ 9, and incurred another $19,328.00 in connection with the Debtor's instant Motion. See Supplemental Noall Declaration at ¶ 10. Meanwhile, the Debtor incurred attorneys fees and costs of $1,207,140.68 during the Chapter 11 proceeding. See Order Granting Fox Rothschild LLP's Third and Final Application for Compensation and Reimbursement of Expenses entered June 23, 2017. (ECF No. 470).

See Monthly Operating Report, Month Ended May 2017, filed June 20, 2017. (ECF No. 469).